MARCH 13, 1945

**No. 6120.**— 

—*Eurasia Import Co., Inc.* v. *United States.* Entered at New York, N. Y. Reap. Dec. 6092. Motion by appellee.

UNITED STATES *v.* WM. S. PITCAIRN CORPORATION

**No. 6121.**—Invoices dated Birmingham, England, September 6, 1941. Entered at New York, N. Y., October 10, 1941. Entry No. 718987, etc.

First Division, Appellate Term

(Decided March 27, 1945)

*Paul P. Rao*, Assistant Attorney General (*Daniel I. Auster*, special attorney), for the appellant.

*Benjamin A. Levett* (*Benjamin A. Levett* and *Meyer Ohlbaum* of counsel) for the appellee.

Before OLIVER, COLE, and TILSON, Judges; TILSON, J., concurring; COLE, J., dissenting

OLIVER, Presiding Judge: This is an application for review of the decision and judgment of a single judge (Reap. Dec. 5976) wherein it was held that the so-called British purchase tax levied by the British Government was not a part of the foreign value of certain earthenware and chinaware exported from Birmingham, England, in 1941.

In the decision appealed from, the British Purchase Tax Law (Finance (No. 2) Act, 1940, 3 and 4 Geo. 6, chapter 48) and the regulations issued by the British Government in connection therewith

are examined and analyzed at such great length that we deem it unnecessary to repeat all the details here.

The merchandise before us was entered on the basis of export value as that value is defined in section 402 (d), Tariff Act of 1930. It was appraised on the basis of foreign value as that value is defined in section 402 (c) of said act, the difference between the two being intended to represent the amount of the so-called British purchase tax. The appraiser added 16⅔ per centum to the entered values on one class of this merchandise, tableware (Reappraisement 142112–A), and 33⅓ per centum on the other class of merchandise, fancy ware (Reappraisement 142113–A). These respective additions represent the rates of the British purchase tax in force on the dates of exportation.

No tax is imposed on merchandise exported from Great Britain.

Upon the trial counsel entered into a stipulation (exhibit 2) as follows:

1. That the merchandise involved is earthenware and chinaware, consisting of tableware and so-called fancy articles exported from Birmingham, England, on September 16, 1941.

2. That the entered value of such merchandise is the export value thereof as defined in sec. 402 (d) of the Tariff Act of 1930, as amended.

3. That the appraisement of said merchandise by the appraiser was made on the basis of the foreign value as defined in sec. 402 (c) of the Tariff Act of 1930, as amended. It is not to be construed that the importer concedes the appraised value as being the foreign value under the statute for such or similar merchandise.

4. That 16⅔ per centum or 33⅓ per centum added to the entered value by the appraiser respectively in reappraisements 142112–A and 142113–A, is not applicable to the item of packing.

5. That at the time of exportation of such or similar merchandise to the United States such or similar merchandise was freely offered for sale for home consumption in Great Britain and for export to the United States to all purchasers in the principal market, the so-called "Staffordshire Pottery District," comprising among others the following cities and towns in England, namely, Burslem, Cobridge, Fenton, Hanley, Longport, Longton, Stoke-on-Trent and Tunstall, in the usual wholesale quantities and in the ordinary course of trade.

6. That the price for home consumption or for export to the United States is not affected by the quantity sold.

7. The facts stipulated are expressly made exclusively for these two cases and no others and may not be considered as binding on either of the parties hereto as to any other pending case or cases that may arise on this subject matter, and this understanding is of the essence of this stipulation, it being understood that the facts here stipulated may not be construed as being stipulated in any subsequent case in which the record herein may be incorporated.

Thus the sole question before us is whether or not the so-called British purchase tax is a part of the foreign value as that value is defined in section 402 (c) of the Tariff Act of 1930.

The British purchase tax was imposed on certain specified merchandise sold for consumption in the United Kingdom. The articles thus subject to the tax are described as "chargeable goods." The

earthenware and chinaware under consideration were "chargeable goods," that is, they were subject to this tax when sold for home consumption.

The invoice prices for the earthenware in reappraisement 142112–A were the manufacturer's unit price list prices, plus 50 per centum, less 2½ per centum cash discount, plus packing, and for the fancy goods in reappraisement 142113–A were the unit price list prices, plus 30 per centum, less 2½ per centum cash discount, plus packing.

The manufacturer (exporter) of the merchandise in both the entries now before us, states in his affidavit (exhibit 4):

That in every instance, the prices mentioned in such price list represent the prices charged * * *.

The above statement may be misleading, as it is clear from the entire record that the prices set forth in the various manufacturers' price lists are not net prices but are subject to definite percentage plussages and cash discounts as indicated above.

The purchase tax under the British purchase tax law was to be figured on the wholesale value (sec. 18 (1)) which was to be determined by the Commissioners of Customs and Excise (sec. 21 (1)) and to become due on delivery of the goods (sec. 22 (2) (a)). Such value was to include the "cost of delivery to the buyer at his place of business, and of insurance and other costs, charges and expenses incidental to such delivery" (eighth schedule, sec. 21, par. 2 (b)). The manufacturer or "registered" buyer (seller), whichever sells to an "unregistered" buyer, is held to be "accountable" for the tax (sec. 22 (1) (a)). The item of tax was to be noted as a statement on the invoice indicating the amount due, for which the seller "may be accountable" (sec. 27). When collected by the manufacturer, it was handled as a separate account, the manufacturer collecting the tax for the Government to whom remittance was made every 3 months (notice 77, pars. 52 and 53, part of exhibit 19).

When purchases were made by "registered" buyers the tax was not collected by the manufacturer if the goods were for stock and subsequent resale. If the goods were for the buyer's own use, that is, not for resale, even though the buyer be "registered," the tax was collected by the manufacturer. If the sale was to a "registered" buyer for resale, and later resold to another "registered" buyer for resale, no tax was collected on either transaction (notice 74, pars. 1 and 18, part of exhibit 3). It was not until the "registered" buyer sold and delivered the merchandise to an "unregistered" buyer or consumer that the tax was collected by the "registered" buyer and by him transmitted direct to the Government. In the case of sales by the manufacturer direct to an "unregistered" buyer or to a consumer the tax accrued upon delivery of the merchandise, and was collected by the manufacturer. A "registered" seller then was in the same position as the

manufacturer described above. He was "accountable" for collecting the purchase tax from his customer and in turn remitting it at fixed periods to the Government.

We consider that by the use of the term "accountable for" the tax, the British lawmakers intended the word "accountable" to be construed in its ordinary meaning. We do not understand this word to be synonymous with "liable for." We give it its common meaning such as, "Liable to be called to account, as for the fulfilment of a duty or the execution of a trust" (Funk & Wagnalls New Standard Dictionary, 1942 Ed.). It connotes a possible future liability upon failure to account for or pay over funds collected for another.

The purchase tax was not referred to in the manufacturer's price lists which offered the various items of earthenware and chinaware based on the price list prices, delivered "at works" (price list part of exhibit 11; Home Trade Scale List, 1930, part of exhibit 19). The tax was not based on the manufacturer's prices at his warehouse, loading platform, or "at works." The tax was based on the cost *delivered* to the purchaser's place of business wherever that might be. The tax did not accrue until the date of delivery and was computed at the rate of tax prevailing at the time delivery was made to an "unregistered" purchaser or to a "registered" purchaser for consumption in his own establishment (notice 77, par. 25, part of exhibit 19).

When the manufacturer offered this merchandise for sale based on the price list prices, these prices being the same to all purchasers, he had no way of knowing when or to whom he would sell, whether or not he would be held accountable for the collection of a tax, or whether or not a tax would eventually be collected by another and remitted to the Government by such other party. The tax was never exacted by the manufacturer nor was it included in his freely offered price for the goods. The manufacturer was held "accountable" for the collection and transmission of the tax when purchases were made by "unregistered" buyers or consumers from such manufacturer, and the failure to so collect and transmit created a liability as a tax debtor (sec. 31 (2), exhibit 1). Even this contingent "liability" was conditional. In the event an "unregistered" buyer became insolvent, the manufacturer or "registered" dealer (seller) was relieved from the responsibility of collecting and transmitting the tax and in the event he had anticipated its collection and had remitted the tax to the Government, he could have it refunded (notice 77, par. 57, part of exhibit 19). Moreover, the law specifically provides (sec. 28) for adjustment between buyer and seller where by operation of law or through change of rate the seller had turned over to the Government more or less than he had collected.

The question before us is whether or not the single judge erred in

holding such a tax, so imposed, to be no part of the foreign value of these goods.

The British Government, exercising its power to levy taxes, was simply an alert observer at the time the manufacturer offered merchandise for sale. It exercised no control over the prices offered, and imposed no obligation on the manufacturer before a sale was consummated. In fact, the Government manifested no active interest in the transaction until *after* the offered price had been accepted and delivery had been made, and even then only when the transaction involved "chargeable" goods and a "chargeable" purchase.

The British purchase tax is not a part of the manufacturer's freely offered price. The most that can be said is that at the time of the offer the buyer is aware that *his cost* may be increased above such offered price to the extent of an unfixed, yet-to-be-determined sum represented in the form of a tax upon the delivered price of the merchandise. He may have some idea of what to expect by the rate of tax in force at the time he places his order, but such rate is not controlling because the tax he must pay will be that in effect at the time delivery is made. Neither the date the merchandise is offered nor the date an order is accepted controls the amount or rate of the tax to be paid. It will also be noted that while the tax is figured on the delivered cost to the buyer, the manufacturers' freely offered prices are "at works" in the Staffordshire Pottery District.

It is evident that, except in extraordinary circumstances, someone eventually pays the purchase tax to the Government, whether through the manufacturer or through the "registered" dealer. It is the Government, not the manufacturer, that decrees that the tax on the delivered price shall be paid by the "unregistered" buyer or consumer to the Government, through the manufacturer when they buy from the manufacturer. In the case of the "registered" buyer it is again the Government and not the manufacturer that decrees that these wholesalers are not accountable for the tax until the merchandise has been resold and delivered by them (unless consumed by them) and the tax would then be paid not through the manufacturer but direct to the Government. In fact, special provisions were made for adjustments of the tax on merchandise damaged or lost in transit (notice 77, par. 56, part of exhibit 19).

The Government (appellant) asserts that in the present case there are two separate classes of buyers and has cited much authority in support of the well-established principle of reappraisement law that "the law is not concerned with the persons who buy but the manner in which they buy" citing *United States* v. *Richard*, 15 Ct. Cust. Appls. 143, T. D. 42216. This legal principle is not disputed, but it has no application to the present state of facts.

We are not adopting sales to any particular class of purchasers be-

cause there is here no class distinction or preference. The same price is offered to all and the fact that the burden of collecting the tax and remitting it to the Government is shifted from the shoulders of the manufacturer to the "registered" dealer, in those cases where he buys for resale, does not change the situation. This is not a sales tax. The tax is not added by the manufacturer before offering and selling his goods.

There can be but one market value for dutiable purposes (*United States* v. *Minkus*, 21 C. C. P. A. 382, T. D. 46912). It is academic that the price paid for an article does not determine its value for customs purposes.

In the case now before us, if the interpretation of the Government (appellant) is accepted, there will be not one market value, but as many values as there would be purchasers throughout Great Britain. The manufacturer offers to sell this merchandise at certain prices, based on his price list. Those prices are fixed, definite, and certain. The merchandise is freely offered at those prices to all classes of buyers without restriction and apparently covers shipments from stock as well as orders taken for future deliveries.

In the ordinary course of business the buyer would contract for the delivery of merchandise at certain prices, with delivery to be made at some future date. These delivery dates ranged from 18 days to 14 months, the average being 3 months. No one knew what tax, *if any*, would be due on the date the goods were delivered, which was the date the tax accrued.

The Government (appellant) contends that as all buyers could buy in the Staffordshire Pottery District, the purchase price in that district, including the tax, properly represents foreign value. The Government (appellant) here may contemplate a value based only on sales to buyers who took delivery at the seller's warehouse in the Staffordshire Pottery District, but the tax would nevertheless be based on the cost of the delivery to the purchaser's place of business even though that be in the Staffordshire District. Specific provision is made for those instances where "goods are in practice collected by the buyer and an equitable flat rate (of delivery expenses) cannot be framed, an overall addition of 2½ per cent. may for the present be made to the invoice price" (notice 74, par. 25, exhibit 3). The British Government quite obviously contemplated other sales made in the normal commercial manner where deliveries were made by the seller to the buyer and the tax was computed *by law* on the *delivered* price and at the tax rate in force on the date delivery was made. The method used by the appraiser in figuring his appraised value by adding the tax to the invoiced and entered prices, which include packing, was erroneous. That he has exacted less than he might have does not correct the situation.

Our courts have held that certain taxes were part of foreign value because they accrued at the time of manufacture, or at the time of sale by the manufacturer, or before the goods could be introduced into commerce or offered for sale. (*Roger & Gallet* v. *United States,* 12 Ct. Cust. Appls. 201, T. D. 40181; *United States* v. *Passavant,* 169 U. S. 16; *Veolay* v. *United States,* 23 C. C. P. A. 101, T. D. 47766; *Reisinger* v. *United States,* 20 C. C. P. A. 67, T. D. 45683.)

In *Roger & Gallet* v. *United States, supra,* an internal revenue tax on alcohol, used in the manufacture of perfumery, accrued when the alcohol went into the manufacture of the perfumery.

In *United States* v. *Passavant, supra,* the German Government imposed a tax on merchandise when sold by the manufacturers for consumption or resale in the markets of Germany. This case arose under the Administrative Act of June 10, 1890, section 19 of which provided:

\* \* \* that whenever imported merchandise is subject to an ad valorem rate of duty \* \* \* the duty shall be assessed upon the actual market value or wholesale price of such merchandise as bought and sold in usual wholesale quantities \*· \* \* .

The court noted that "The Act does not contemplate two prices or two market values," and that the "German duty is imposed on merchandise when 'sold by the manufacturers thereof for consumption or sale in the markets of Germany'; and 'is collected when the finished product goes into consumption in Germany.' As the tax accrues *when the manufacturer sells,* his wholesale price includes it, and the purchaser who buys \* \* \* pays a price covering the tax, and that is the price for the merchandise when bought and sold in those markets." [Italics supplied.]

The language of the present law (section 402 (c), Tariff Act of 1930) has been substantially changed from that used in the Act of June 10, 1890, the present law providing that the foreign value:

\* \* \* shall be the market value or the price \* \* \* at which such or similar merchandise is freely offered for sale for home consumption to all purchasers \* \* \*.

Regardless of this change in language, we find a different set of facts in the record now before us and are of opinion that the *Passavant* case, *supra,* cannot be controlling here.

In the present case, the so-called purchase tax does not accrue "when the manufacturer sells." The tax does not become a charge until the goods pass to an "unregistered" buyer or consumer and the tax rate in force on such delivery date determines the amount of the tax.

In *Veolay* v. *United States, supra,* the tax, while based on the retail price as a standard, accrued before the products were permitted to be "put into commerce to be offered for sale or sold."

In *Reisinger* v. *United States*, *supra*, the court said (page 70):

The tax is paid by some one upon the merchandise sold in the German market and becomes *due and payable upon the sale being made*. So far as the German Government is concerned, its collection is *enforced at the source* of that particular sale which "introduces the merchandise into the open market." The *seller is liable*, and the tax is actually collected by the Government from such seller, who in turn, in the ordinary course of trade, collects it from the purchaser. It is included—must be included—upon the invoice made by the seller to the purchaser. Even if the tax debtor gives the merchandise itself away, it is still subject to have applied to it "as assessable value * * * the price for similar illuminants," under authorized regulations, and said tax debtor is *liable for the tax* so assessed. [Italics supplied.]

And, on page 71:

* * *. It evidently is a sales tax passed on to and finally paid by the ultimate consumer of the article upon which levied.

The fact that the tax was required to be separately listed upon the invoice from the tax debtor to the purchaser does not change the law as to its being a tax.

In the present case while the tax almost invariably is to be paid by someone, the tax does *not* become "due and payable upon the sale being made." The seller is not liable, but is accountable only for its collection and transmission. While the manufacturer is required to "indicate" the tax on the invoices to "unregistered" buyers or consumers, the amount of the tax is not added to each individual item, but is added to the total, and unlike the facts in the *Reisinger* case, *supra*, the manufacturer here is not "liable for the tax." We do not understand the court in the *Reisinger* case, *supra*, to be asserting the broad principle that *because* "the tax is paid by someone upon the merchandise sold in the market" that it therefore becomes a part of the market value. Rather, it would appear that for such a tax to become a part of such value, it would necessarily have to become "due and payable upon the sale being made." To this it would seem logical to add that it must also have been included by the manufacturer as *part* of his freely offered price and that he was primarily liable for such tax, and finally that such tax be known, definite, and certain at the time such merchandise is offered for sale. The tax in the case now before us does not come within the above limitations.

In *United States* v. *Allenby*, 20 C. C. P. A. 80, T. D. 45703, a Japanese tax accrued and was collected when and in the event the merchandise was sold at retail to a Japanese resident. It was there contended, as here, that the foreign value, if one existed, exceeded the export value by the amount of the consumption tax. There, as in the present case, the merchandise might change hands several times before any question of tax arises. The court noted (p. 89) that the court below had not erred in considering and accepting the testimony of witnesses for the importers who testified that:

* * * the tax did not accrue at the time the manufacturer sold; that it was

not included in the manufacturer's wholesale price; that it accrued, and was collected, only in the event the merchandise was sold at retail to a Japanese resident, * * *.

Counsel for appellant contends that foreign value must be found on the basis of the manufacturers' sales to "unregistered" purchasers or consumers who paid the tax, and not upon the price list prices which it is claimed are allowed only to special customers ("registered" dealers). It is argued that this case is analogous to cases where varying discounts are allowed to different classes of purchasers (*Goldmark* v. *United States*, 22 C. C. P. A. 358, T. D. 47378). We can see no substance in this contention. There are not varying prices quoted here to different classes of customers. The manufacturers' selling prices are freely offered to all purchasers. That the registered buyers, *by operation of law*, are not held "accountable" for the tax until such time as they resell the goods, is not a special consideration by the manufacturer.

The record does not support the contentions of counsel for appellant, that the tax is included, actually or impliedly, as part of the price paid when such or similar merchandise is sold for home consumption or that it is included, actually or impliedly, in the freely offered price. The tax is computed on the "wholesale" value as defined in the British law, which may or may not be the same as the price defined in our statute, section 402 (c). The tax is computed "at the time of delivery," not at the time of the offer or sale, and is based on a value which must include delivery charges and other expenses. Finally, the tax rate is that which is in force on the date of delivery rather than at the time the offer is made or the order is accepted.

It certainly cannot be successfully asserted that because a tax will be imposed at some future time at a rate then in force which will be collected from the purchaser, that such an indefinite item will be held to be a part of the freely offered price.

Upon the record we find the following facts:

1. That the merchandise consists of earthenware and chinaware imported from England.

2. That at the time of exportation, when such or similar merchandise was sold and delivered by the manufacturer to an "unregistered" buyer or consumer, a so-called British purchase tax was imposed on the price delivered to the purchaser's place of business at the rate of tax in effect at the time of delivery, the manufacturer being "accountable" for the collection of the tax and its transmission to the Government.

3. That at the time of exportation, when such or similar merchandise was sold and delivered by the manufacturer to a "registered" buyer (except for such buyer's own use), the so-called British purchase tax was not imposed.

4. That the so-called British purchase tax formed no part of the

manufacturer's selling price or freely offered price, either actually or impliedly.

5. That no tax was imposed on such or similar merchandise when exported from Great Britain.

6. That at the time of exportation such or similar merchandise was freely offered for sale to all purchasers, in the usual wholesale quantities, in the ordinary course of trade, in the principal markets of the country from which exported (Great Britain), either for home consumption or for exportation to the United States at the entered values.

We conclude as matter of law, that the foreign and export values of the involved merchandise are the entered values, and the judgment of the single judge is therefore affirmed.

Judgment will be rendered accordingly.

### CONCURRING OPINION

Tilson, Judge: In my opinion, this record establishes that, in the ordinary course of trade, the tax here in question never attaches to the goods until they have come into the hands of the retailer for distribution to the public; that prior to that time, in the ordinary course of trade, the goods are freely offered for sale to all purchasers without the tax being included; that at or about the dates of exportation of the instant merchandise the various manufacturers of such or similar merchandise in England, freely offered the same for sale for home consumption, and for export to the United States, to all purchasers in the usual wholesale quantities, and in the ordinary course of trade, at the invoiced and entered prices, which did not include the amount of the tax here in question.

In all the tax cases relied upon by appellant where the tax has been held to be a part of the value of the goods, the tax attached at or prior to the time the goods entered the trade and commerce of the country. That is not true in the instant case, and this fact, therefore, distinguishes those cases from the present case. I, therefore, join in the decision and judgment of my associate, Presiding Judge Oliver.

### DISSENTING OPINION

Cole, Judge: Section 402 (c) of the Tariff Act of 1930, as amended by the Customs Administrative Act of 1938 (19 U. S. C. 1940 ed. § 1402 (c)), provides the yardstick by which foreign value is determined. Its birth and subsequent development combine to reflect a painstaking and essentially sound pronouncement by Congress to meet one of the most important provisions of our tariff structure. It has been productive of much of the very interesting and learned contributions to customs jurisprudence. I cannot bring myself to accept the court's conclusion herein as properly interpretive thereof.

It should be emphasized that, for the purposes of the present issue, we are concerned only with the class of transactions involving chargeable items under chargeable purchases, the category in which the item under consideration belongs. Transactions between registered dealers where the tax does not apply and contingencies which may relieve payment of the tax are not germane to this case.

As I view the reasoning of Presiding Judge Oliver's opinion in excluding the tax as part of dutiable foreign value, it is based on the premise that the tax is not susceptible of application in all cases and therefore cannot be applied in one. For instance, if it would be conceded that the appraiser should add to the entered value the item in question, such could be readily done in the case of sales where the merchandise had been actually delivered, but in the many cases where delivery had not been made it would be impossible to add to the list price this additional element of value—delivery costs—that the law requires, thereby making the amount upon which the tax should be computed incapable of actual determination. I do not believe we should be seriously concerned with such a possibility; certainly, not sufficiently so to make it determinative of the important issue before us.

It is one thing to say that the tax in question is part of foreign value as statutorily defined. Such is this opinion. It is another thing to say that it is difficult in some instances, as appearing from the present record, and in other instances perhaps impossible to determine definitely the exact amount upon which such tax should be computed. That enters into the mechanics of the operation and is not the concern of the court in this instance. Without meaning to discard such an obvious difficulty, attention is directed to the apparent anticipation of the British authorities to just such a situation as this, for the basic law, itself, as discussed and set forth in full in Judge Keefe's opinion, provides:

COMMISSIONER'S NOTICE No. 79.

\* \* \* \* \* \* \*

3. Delivery Expenses.—If goods are not sold at a price free delivered to the buyer's premises, the cost of delivery must be added to the price when calculating the tax value. \* \* \*.

Where \* \* \* owing to lack of information, or, for example, where goods are in practice collected by the buyer and an equitable basis cannot be framed, an overall addition of not less than 2½ per cent, may be made to the price. Alternative proposals for arriving at a fair average delivery charge should be submitted in the first place to the local Officer of Customs and Excise.

The application of the foregoing catch-all provision is capable of but one interpretation; that is, its use in complete destruction of the concern expressed by the court in cases where information as to delivery costs is lacking.

The tax in question is inherently a sales tax that attached to the dutiable foreign value, section 402 (c), as amended, *supra*, of the merchandise in question at the time of its exportation. That the tax is not included in the manufacturer's list prices offering the merchandise is not the criterion for proper disposition of the present issue. Nor is the date when the tax becomes due conclusive. The controlling consideration is that the tax, when chargeable items are bought under chargeable purchases, is, as stated in *General Dyestuff Corp.* v. *United States*, 19 C. C. P. A. 309, T. D. 45480, "inseparable from the transactions." While the cited case did not involve the identical question presented in the instant case, the court recognized application of a legal principle analogous to one invoked in *Hugo Reisinger (Inc.) et al.* v. *United States*, 20 C. C. P. A. 67, T. D. 45683, which has controlling influence on the conclusion reached herein. In that case, as in the present, the tax was imposed on merchandise destined for home consumption, and the foreign Government collected it from the seller, who showed it on the invoice as a separate item. In the *Reisinger* case, the court found that the tax is evidently "a sales tax passed on to and finally paid by the ultimate consumer of the article upon which levied," which is equally true of the item under consideration. The opinion of Presiding Judge Oliver, seeking to distinguish that case, states that "unlike the facts in the *Reisinger* case, *supra*, the manufacturer herein is not 'liable for the tax,'" but in making this distinction and emphasizing that the manufacturer is merely accountable for the tax, the mandate of the British law (section 31 (2)), which requires that the tax "shall be recoverable as a debt due to His Majesty from the person accountable therefor," is not accepted. The British law very specifically places a dual responsibility upon the seller who must not only render an accounting of the tax due but also assumes liability for its payment under chargeable transactions. Clearly, the foreign law under consideration, like the one involved in the *Reisinger* case, *supra*, makes the seller the tax debtor.

The conclusion reached herein is consistent with the basic law expounded in *United States* v. *Passavant*, 169 U. S. 16, holding as part of dutiable foreign value a tax imposed by the German Government on cotton velvets sold by manufacturers to purchasers for home consumption whose price included the tax that was not collected until the finished product went into consumption in Germany.

Appellant's contention does not produce the chaotic condition implied in the court's statement that "if the interpretation of the Government (appellant) is accepted, there will be not one market value, but as many values as there would be purchasers throughout Great Britain." The statement seems to be based upon an apparent uncertainty arising from the standard—"wholesale value" as defined

in the British Finance Act of 1940 (Part V, Purchase Tax)—adopted by the British Government for computing the amount of the tax. "It is not the standard which is of importance, but the matter of payment," *Veolay* v. *United States* (23 C. C. P. A. 101, T. D. 47766). For tariff purposes, the applicable rate of the tax under consideration is that prevailing at the time of exportation of the merchandise, and, as hereinabove set forth, the foreign law provides for "an overall addition of not less than 2½ per cent" if information is lacking concerning actual delivery charges (Commissioner's Notice 79, *supra*).

*United States* v. *Allenby*, 20 C. C. P. A. 80, T. D. 45703, is distinguishable from the present case. There, the court held a so-called Japanese consumption tax not to be part of dutiable foreign value, basing its conclusion on facts which included a showing that the tax "accrued, and was collected, only in the event the merchandise was sold at retail to a Japanese resident." In other words, it was a tax imposed only on retail transactions and therefore very definitely not an element included within dutiable foreign value. The item in question is not confined to such a narrow application. The British tax under consideration is an integral part of transactions in wholesale quantities of earthenware and chinaware sold to chargeable purchasers in the ordinary course of trade, in the principal market of the country of exportation. As such it is an element of the dutiable market value at which the merchandise is offered to all purchasers, and therefore should be included in statutory foreign value, section 402 (c), as amended, *supra*.

The judgment of the lower court should be reversed. I therefore respectfully dissent from the conclusion to the contrary of the majority.